### MONTGOMERY v. McDERMOTT et al. (two cases).

#### (Circuit Court of Appeals, Second Circuit. July 25, 1900.)

##### Nos. 163, 164.

**1.** ATTACHMENT—INTERESTS SUBJECT TO LEVY—GRANTOR OF PROPERTY IN TRUST.

An absolute conveyance by two persons of property owned in severalty to trustees, the trust agreement providing for the issuance by the trustees of certificates to the beneficiaries, which shall be transferable, and that all income from the trust property and the proceeds of its sale shall be divided ratably among the certificate holders, leaves no interest in a grantor in any specific property conveyed which can be the subject of an attachment; his only interest being as a certificate holder, which he can only enforce by an enforcement of the trust in a court of equity.

**2.** SAME—EQUITABLE INTERESTS.

Under Code Civ. Proc. N. Y. § 645 et seq., relating to attachments, as construed by the highest court of the state, a lien cannot be acquired by an attachment on the equitable interest of a defendant in property, which will operate through an intermediate legal title in another; and where a defendant has transferred a chose in action, or an instrument evidencing an equitable interest in property, although such transfer is claimed to be fraudulent or colorable, a creditor cannot obtain a lien on his interest therein by attachment.

**3.** FEDERAL COURTS—FOLLOWING STATE DECISIONS.

Where conflicting decisions construing a state statute have been rendered by the highest court of a state and a commission created by law

---

[1] Diverse citizenship as ground for federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249, and Mason v. Dullagham, 27 C. C. A. 298.

103 F.—51

to assist such court, a federal court will follow the construction adopted by the permanent court.

4. ATTACHMENT—LIEN ON EQUITABLE INTERESTS—ANCILLARY SUITS.

Two persons made an absolute conveyance of property, both personal and real, to trustees; the interests of the beneficiaries to be evidenced by trust certificates issued by the trustees to the grantors and another; each certificate having a nominal value, and being transferable on books to be kept by the trustees. The trust agreement further provided that all net income from the property and all proceeds of any sold should be ratably divided between the certificate holders, and that, on demand of a specified proportion of such holders, the property remaining should be sold and the proceeds ratably divided. One of the grantors to whom certificates had been issued transferred a number of the same in trust for his wife. A creditor of such grantor commenced an action by attachment against him in New York, the defendant being a nonresident, and caused the attachment to be levied by serving notice on the trustees who held the title to the trust property. *Held* that, under the statutes of the state (Code Civ. Proc. § 645 et seq.), such attachment was ineffectual to create a lien upon any property of the defendant which would sustain an ancillary suit in equity to set aside his transfer of the trust certificates as in fraud of his creditors, or to reach his claimed interest in the trust property.

5. JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—ANCILLARY SUIT.

A federal court has jurisdiction of a suit in equity between citizens of the same state to reach equitable assets of a nonresident debtor, against whom the complainant has an action in attachment pending in the same court, only when the complainant has by his attachment acquired a lien on property of the defendant which will render the suit in equity ancillary to the action at law.

Appeals from the Circuit Court of the United States for the Southern District of New York.

These are two suits in equity in aid of two actions at law brought by the same plaintiff to enforce alleged liens of attachment upon property of James McHenry, which it is claimed were obtained by service of the warrants in the actions at law, and which "have become defective by the death of McHenry and the nonappearance of a personal representative" in such actions at law. The suits were heard on pleas and answers and proofs. The circuit court held that: "If no attachment had been issued in the action at law, it is manifest that there would be nothing on which to base the action in equity. It is only because of the lien alleged to have been acquired that the aid of equity is invoked. If the complainant had no lien, there was nothing for equity to aid. The mere fact that an attachment issued is of no consequence, unless it fastened itself upon some property of the defendant, and impounded it so that the plaintiff could reach it if he obtained a judgment." The circuit court further held, upon the question whether or not the attachments had become liens on any property of McHenry, that the complainant was concluded by an adverse decision of the state supreme court in an action of interpleader wherein the complainant and the defendants Perkins, Fowler, and Dunning were parties. The bills were dismissed (99 Fed. 502), and complainant appealed. The facts are sufficiently set out in the opinion.

W. W. MacFarland and Stephen H. Olin, for appellant.

C. C. Beaman and E. C. Perkins, for appellees.

Before LACOMBE and SHIPMAN, Circuit Judges, and THOMAS, District Judge.

LACOMBE, Circuit Judge (after stating the facts as above). From 1871 to 1875 James McHenry became indebted to the law firm of Barlow, Larocque & MacFarland in a very considerable sum for profession-

al services, and also to Samuel L. M. Barlow for services rendered in 1872 and 1873 in the purchase of a large amount of railroad shares. These claims were assigned to the complainant, Montgomery, in December, 1886. They are the subject of suit No. 1. McHenry also became indebted, April 5, 1873, to Charles Day, in a considerable sum, on account of certain Atlantic & Great Western Railroad bonds. This claim, also, was assigned to Montgomery in December, 1886, and is the subject of suit No. 2. Montgomery brought two actions at law on these claims in the state court immediately after these assignments, and upon showing to the court that McHenry was a citizen of Pennsylvania, and a nonresident domiciled in England, obtained warrants of attachment against his property. McHenry appeared in both actions, and removed them into this court, where issue was finally joined in March, 1889. McHenry died in England May 26, 1891, leaving a will appointing the defendants McDermott and Boyd executors. They have never taken out, or caused to be taken out, letters of administration in this jurisdiction, wherefore no further proceedings were taken in the actions at law.

Before discussing the manner in which the sheriff served the warrants of attachment in these two actions,—which service, complainant claims, fastened a lien upon some property of McHenry,—it will be necessary to rehearse a series of events preceding the beginning of Montgomery's two actions in the state court, and, indeed, preceding the assignments of Barlow's and Day's claims to him: On October 2, 1871, McHenry and one Thomas William Kennard, as parties of the first and second parts, the defendant Bischoffsheim, as party of the third part, and Messrs. Barlow and Day, as parties of the fourth part, executed a certain indenture of trust. Thereby, or by conveyances made in advance for the purposes of the trust, McHenry and Kennard assigned, transferred, and set over to Barlow and Day, as trustees, certain "freeholds and leasehold hereditaments, stocks, funds. shares, and securities, and all other the real and personal estate specified in the schedule to [such indenture] annexed." The schedules do not appear in the record, nor is the property more particularly described; but from the phraseology of the indenture, which refers to the property as "conveyed and assigned  *  *  *  by the said James McHenry and Thomas William Kennard, or one of them," it may fairly be inferred that part of it was the joint or common property of the two, part the individual property of the one, and part the individual property of the other. Its value appears to have been considerable. The indenture recites that there was due by McHenry and Kennard to Bischoffsheim upwards of £53,000, and that prior to the incurring of such indebtedness it had been agreed between the three of them that the property enumerated in the schedules should be vested in the trustees as provided for in the deed. A further recital declares that "these presents shall extend to and be a security for any moneys hereafter advanced to the trustees by Bischoffsheim, or his firm, with interest." The trust deed is a voluminous document, but the following brief summary will sufficiently indicate its provisions. So long as there shall be due to Bischoffsheim, or his firm, any money on account of the original debt of £53,000, or on account of advances to the

trustees (which advances are for the purpose of paying off incumbrances on the trust premises, and taxes, charges, expenses, etc., thereon), the trustees, upon his request, "shall sell the said trust premises, or any part and so much thereof as may be necessary, to repay" the same. For the same purpose—viz. the repayment of Bischoffsheim or his firm—the trustees are authorized to borrow such sums as may be necessary, and pledge and mortgage the trust premises for the payment. In order to adjust the respective interests of the parties, it is further provided that the value of all of said lands and trust premises shall be represented by 400 shares or certificates, each representing the nominal sum or value of $5,000. The form of certificate is set forth in the trust deed. It is to be signed by the trustees, and states upon its face that it "has been issued to ————, of ————, who, and those to whom it shall be transferred, shall be deemed the owners thereof." After a reference to the trust deed, the certificate proceeds: "The owner hereof is entitled to receive, subject and according to the provisions of said deed, one equal four-hundredth part of the net rents, issues, revenues, and profits, howsoever arising, according to the provisions of the said deed, and subject to the debts and obligations therein referred to. This certificate is to be held and construed in all courts and places as personal property, and cannot be sold" or transferred except in accordance with the provisions of said deed. The deed calls for an original division of these certificates,— 150 to McHenry, 150 to Kennard, and 100 to Bischoffsheim. Elaborate provision is made for fixing a conventional value for the shares, and changing it from time to time; and the original distributees, and those to whom any shares may have been assigned, are forbidden to sell or transfer any shares until such shares shall first have been offered to the owners of the then remaining certificates at such conventional value. There are similar provisions applicable in the event of the decease or bankruptcy of any certificate holder. The trustees are to keep an office and transfer books, and all other necessary books, and to send every six months to each certificate holder an account and balance sheet showing their transactions for the previous six months, and once in each year a report of the estimated value of the several properties unsold, with the specific charges remaining thereon. By the sixth and seventh clauses of the deed the trustees are given "full and exclusive control and supervision of and over the said lands, property, and premises; * * * to sell and dispose of the same and any part thereof" for cash or on credit or in exchange; and to deal with and concerning the same, in all things, as freely, and according to their own discretion and will, as if they were seised and possessed thereof in their own right. Should, however, three-fourths in number and amount of the certificate holders give specific directions in writing as to such sale or disposition, the trustees shall conform to such directions. After paying all charges and expenses, including their own compensation, the trustees shall from time to time account for and pay over the balance then remaining of the proceeds, moneys, rents, issues, revenues, and profits,—one equal four-hundredth part to each of the holders and owners for each of the certificates by them respectively held. Whenever thereunto required by the owners of

at least three-fourths in number and value of the certificates, the trustees shall convey and assign the lands, premises, and property, or such portion of the same as may then remain unsold, and pay over the balance of moneys and other properties remaining in their hands "to the holders for the time being of said certificates, pro rata, and according to the number and value of said certificates by them respectively held." Provision is made for the appointment of new trustees in place of such as may die, resign, or be removed. Incidentally it may be stated that Barlow and Day, the original trustees, died in July and August, 1889, respectively. The defendant Perkins was appointed their successor June 19, 1890, and the defendant Fowler was appointed co-trustee January 4, 1892. Touching the further disposition of the property conveyed to the trustees, it is finally provided in the tenth clause of the trust deed that it shall be conveyed "upon the request of the holders for the time being of the said certificates, to the amount of three-fourths in value thereof, to sell, convey, and transfer all and every the said estate, property, and effects to them [the trustees] herein granted, sold, and conveyed as aforesaid, or the balance thereof then remaining in their hands, to one or more corporations or stock companies hereafter to be organized under and in accordance with the laws of the states of New York, Pennsylvania, and Ohio, or of either of said states, competent to receive the same, and to be substituted for and take the place of the said parties of the fourth part in relation to said property and estate, so far as the same can be lawfully done or may be deemed advisable, and to hold, manage, and sell said property and estate, upon the condition, understanding, and agreement, however, that the holders of said certificates shall severally be entitled to receive, and shall receive, the shares of the capital stock of the said corporation or corporations, when organized, in the same proportions and of the same nominal value as they then severally hold said certificates, and thereupon the said certificates shall be delivered up to the said parties of the fourth part, and shall become and be of no further effect and void." The property referred to in the deed of trust was duly conveyed and transferred to Barlow and Day, the original trustees. They entered upon the execution of their trust, and continued in the discharge of its duties until their death.

It is not understood that any one who has been heard on this appeal attacks the validity of this trust, or the conveyance of the property with which it is concerned. Our attention is called to no provision of law or statute which it offends. The conveyance was made before the transactions by reason of which the assignors of complainant, who were themselves the trustees, became creditors of McHenry. There is not a scintilla of evidence to show whether McHenry conveyed to the trustees the whole or only a part of his property, or how much property he had, or whether he was indebted to any one but Bischoffsheim, who was provided for in the trust deed to which he was a party. The conveyance, therefore, to the trustees of so much of McHenry's real and personal property as was enumerated in the schedule must be taken as valid. It was an absolute conveyance, and carried the full legal title, with no reservation whatsoever. Thereafter the

grantor had no specific individual interest in any specific piece of property so conveyed. Assuming that among the property conveyed by Kennard there was a parcel A, and among the property conveyed by McHenry there was a parcel B, both of which parcels were then of equal value, and that the next month an oil well had been opened on parcel B, which increased its value one hundred fold, McHenry would not be entitled to claim any individual profit thereby. All the certificate holders would share alike. If, under the terms of the deed, three-quarters of the certificate holders had terminated the trust, McHenry's original property (or what was left of it) would not be reconveyed specifically to him, but pro rata to the holders for the time being of the certificates, according to the number and value by them respectively held. The trustees were not indebted to him. He could maintain no action at law against them to recover the property he had conveyed, nor any specific portion of the proceeds of any property sold. His interest in the corpus of the trust was still property, but it was not tangible property. It was an equitable interest, which he could enforce only through the aid of a court of equity, constraining the trustees to carry out the trust, and thus get funds in their hands, and, having carried it out, to account for his proportion of the net proceeds of their operations.

As we have seen, McHenry received 150 of the trust certificates. At different times during the ensuing three years he transferred 50 of them, in small lots, to different individuals. No attack is made upon these transfers, which were duly registered on the books of the company. On May 16, 1874, McHenry transferred 100 trust certificates to Benjamin Moran, and the transfer was registered on the books of the company. On December 21, 1874, McHenry and Moran executed an indenture by which, in consideration of love and affection, the former settled the 100 certificates upon his wife, with power of appointment to their children, or, in default of children, a general power of appointment. In case no appointment was made, the certificates were to revert to McHenry. Moran undertook to hold the certificates as trustee under this settlement. On November 8, 1877, Leonard J. Woodman was duly substituted as trustee under this settlement in the place of Moran; and on January 11, 1878, Moran assigned the 100 trust certificates to Woodman, in whose name they still stand. Woodman died in 1895, and his wife, the defendant Julia, was appointed administratrix. On May 19, 1883, Mrs. McHenry executed an instrument of appointment of the certificates to William Coutts Keppel, Viscount Bury (afterwards Earl of Albermarle), and Edward McDermott. A few days afterwards she died, leaving no children. It is stated that after her death Mr. McHenry gave these gentlemen a sealed packet, which was not opened until some time later, which ran as follows:

"Of the funds arising from the realization of the American estates received by your lordship and Mr. McDermott from my wife, I wish that a disposition be made in the manner laid down in my will, as if they formed part of the property under my control at my death."

We do not find proof of this in the record. The reference in the brief is to a statement in the "opinion" of Mr. Justice North approving a compromise of the suit of McDermott v. Boyd. The same

"opinion" states that the appointees of Mrs. McHenry repudiated any suggestion of a secret trust, and insisted that the appointment was absolute, to be dealt with by them at their uncontrollable discretion. For the purposes of the appeal now before us, however, it may be assumed that McHenry did give such a packet to the appointees. As was stated before, McHenry died in London May 26, 1891.

Complainant contends that the conveyance of the 100 certificates to Moran and to Woodman in trust for McHenry's wife was without consideration, in fraud of creditors, and, as against his assignors, who were creditors before such conveyance, was wholly void, and that, in determining the question what lien was secured by the service of the warrants of attachment, the situation is the same as if McHenry had held these 100 certificates registered in his own name continuously from 1871 till his death. What happened in the actions at law was this: The deputy sheriff served on the trustees certified copies of the warrant of attachment, accompanied by the usual sheriff's notice, on December 23, 1886; and the question now to be decided is whether such service fastened a lien either upon any specific property, real or personal, in the possession of the trustees, and of which they held the legal title, or upon the equitable interest of McHenry in the property held by them, to the extent of the proportion which the 100 certificates bore to all the certificates outstanding. The first of these alternatives is already answered in the negative. The discussion and construction of the trust deed supra show quite plainly that neither attachment nor execution against McHenry could cut through the legal title of the trustees, and sever from the whole property held by them some specific parcel, upon any theory that it still remained his. The other suggested alternative remains to be considered. The subject of attachment as a provisional remedy in actions at law is regulated by statute in New York. The Code of Civil Procedure specifies the cases in which it shall be granted, upon what it shall be levied, and in what way such levy shall be made. This circumstance greatly simplifies the question. The dissertations of text writers and the opinions of judges sitting in other states may be interesting and instructive, but they are not authoritative, nor even persuasive, when opposed to the decisions of the state court of last resort construing a state statute. The several sections of the Code of Civil Procedure in force in 1886 provided that the real property which may be levied upon by virtue of a warrant of attachment includes any interest in real property, either vested or not vested, which is capable of being aliened by the defendant; that the rights or shares which the defendant has in the stock of an association or corporation, together with the interest and profits thereon, may be levied upon; that the attachment may also be levied upon a cause of action arising upon contract, including a bond, promissory note, or other instrument for the payment of money only, negotiable or otherwise, whether past due or yet to become due, which belongs to the defendant, and is found within the county,— the levy of the attachment thereupon to be deemed a levy upon the debt represented thereby. It provides that a levy under warrant of attachment must be made as follows: (1) Upon real property by filing a certain notice with the county clerk; (2) upon personal property,

capable of manual delivery, including a bond, promissory note, or other instrument for the payment of money, by taking the same into the sheriff's actual custody; (3) upon other personal property, by leaving a certified copy of the warrant, and a notice showing the property attached, with the person holding the same, or if it consists of a demand, other than as specified in the last subdivision, with the person against whom it exists, or if it consists of a right or share in the stock of an association or corporation, or interests or profits thereon, with certain specified officers thereof. And the sheriff is expressly required to collect and receive all debts, effects, and things in action attached by him, and may maintain any action or special proceeding, in his name or in the name of the defendant, which is necessary for that purpose. Code Civ. Proc. §§ 645, 647–649, 655. The property which it is claimed was levied upon in Montgomery's actions at law was not an interest in real property which was capable of being aliened by McHenry, nor was it a right or share in the stock of an association or corporation, nor was it a bond or other instrument for the payment of money which was found within the county, nor was it personal property capable of manual delivery (and, indeed, if it were, it was never levied upon, for it was never taken into the sheriff's actual custody), nor was it a cause of action arising upon contract. No copy of the warrant of attachment and no notice were ever served upon the person who held the certificates, and neither the holder of the certificates nor McHenry owned any "demand against" the trustees which could be enforced in a court of law. From the careful enumeration in the sections above cited of property which may be levied on, it might be inferred that varieties of property not enumerated were not subject to such lien. But we are not left to mere inference. The precise point has been passed upon by the New York court of appeals. In Thurber v. Blanck, 50 N. Y. 80, appeals from orders of the general term in two separate actions were discussed together. The first action was brought upon a Wisconsin judgment, and an attachment issued thereon against defendant as a nonresident. He had formerly resided in this state, and owned a house and lot in New York City. This he sold, receiving a bond and mortgage thereon for a portion of the purchase price. These he assigned to one Peter Cook, who on the same day assigned them to Sophia Blanck, defendant's wife, and left the state. It was claimed by plaintiff that the assignments were without consideration, and made with intent to defraud creditors. By virtue of the attachment the sheriff attempted to levy upon the bond and mortgage, by serving certified copies upon the obligors and mortgagors, with notice indicating the purpose to attach the same. Summons in that action was served by publication, and, in default of appearance, judgment was perfected therein against the defendant, and execution issued thereon. Thereupon plaintiff commenced a second action against Blanck, his wife, Cook, the mortgagors, and others, to set aside the alleged fraudulent assignment, and to subject the mortgage to the lien of the attachment, and apply the same to the lien of the judgment. Plaintiff obtained at special term an ex parte order appointing a receiver of the bond and mortgage. The general term set aside the order appointing the receiver and dismissed the second

action. The special term also entered an order vacating the judgment in the first action. Under the Code and rules of practice, judgment could be entered against a defendant in default who had been served by publication only, and who had not appeared, only upon proof that an attachment had been actually levied upon property of the defendant. The general term sustained the special term, and the court of appeals sustained the general term, in both actions. The opinion is by Chief Justice Church. It begins with a reference to Lawrence v. Bank, 35 N. Y. 320, in which "it was held that the proceeds deposited in a bank, of property fraudulently assigned, in the name of the fraudulent assignee, could not be attached as a debt due the assignor, and that the sheriff could not bring an action under the Code to recover such deposit or subject it to an attachment." Some conflicting decisions in the state supreme court are referred to, various sections of the Code then in force are cited (substantially the same as those set forth supra, except that the specific provisions as to a cause of action arising on contract, including a bond, note, or other instrument for the payment of money, which is found within the county, are not in the earlier Code), and the questions arising under the appeal in the second action are discussed. The opinion then proceeds:

"The more serious question relates to the first action in which the attachment was issued. The ground for commencing the action and for issuing the attachment was that the defendant was a nonresident, and had property within this state. The bond and mortgage was claimed to be levied upon by virtue of the attachment, by leaving a copy with the debtor and serving the required notice."

After discussing briefly the effect of the provisions authorizing the sheriff to maintain action in aid of the attachment (sections 232, 237, Old Code; sections 647, 655. 708, New Code), the court lays down the law as to levy of attachment under the Code:

"In the case of personal chattels, the sheriff seizes the property and takes it into his possession, and renders himself liable to an action by the claimant. He acquires by such seizure a specific lien, and this court has held that the creditor may defend the lien obtained by attachment and levy, and thus litigate the title of the claimant to the property. This decision does not violate the general rule that none but judgment creditors can attack a fraudulent transfer, but recognizes the exception in favor of those who have specific liens upon the property. In the case of choses in action and debts, the lien is constructive, and cannot operate through an intermediate legal title. That title to the bond and mortgage was in a third person [as were the 100 certificates assigned to Moran and Woodman in the case at bar], and the property was not, and could not be, interfered with. At law no debt was owing to the defendant [none certainly was owing from the trustees to McHenry, even if he still retained the 100 certificates], and there was nothing for the attachment to operate upon. Such a lien can only be created upon legal rights, and not mere equitable interests. Debts and choses in action are to be regarded as legal assets, under the attachment laws, whenever that process acts directly upon the legal title; but, whenever they are so situated as to require the exercise of the equitable powers of the court to place them in that situation, they must be treated, as they always are, as equitable assets only."

And the court sustains the order vacating the judgment in the first action, manifestly because there was no proof of a levy upon any property of defendant. This decision so closely covers the points raised on this appeal that it will be necessary only to examine later decisions of the same court, to see if it has been reversed or modified. Thurber

v. Blanck, supra, was argued June 10, 1872, and decided November 12, 1872, by the court of appeals. On October 3, 1872, the case of Bank v Dakin, 51 N. Y. 519, was argued before the commission of appeals,— a temporary court of last resort, created to assist the court of appeals in disposing of an overcrowded calendar. It was decided January, 1873. Neither in the briefs of counsel nor in the opinion is there any reference to Thurber v. Blanck, which presumably had not yet appeared in the Reports. In Bank v. Dakin the plaintiff had commenced an action on a promissory note against Dakin, as a nonresident. An attachment was issued and served on one Miller for the purpose of attaching a debt claimed to be due from him to Dakin, and secured by bond and mortgage. The plaintiff obtained judgment in that suit, and issued execution, which remained unreturned. After giving the note, and before the commencement of the suit, Dakin assigned this bond and mortgage to his brother-in-law. This assignment was claimed to be without consideration and fraudulent as to creditors, and plaintiff thereupon commenced a second action to set the assignment aside. Relief was refused below, and from such refusal appeal was taken. The opinion of the commission refers to various kinds of creditors' bills, but holds that the action does not come within them. Nevertheless it accords relief, and does so on the sole ground that "it is an action to enforce a lien upon a particular security seized by an attachment proceeding." "The property seized," says the commission, "is held by the attachment and execution. * * * The plaintiff has a specific lien upon the mortgage." It further held that the sheriff might have brought a similar action, under the express authority of section 232, Old Code. The mere statement of the facts and the conclusion shows that the decision in the Dakin Case conflicts with that in the Thurber Case,—a circumstance which is alluded to in all later editions of 51 N. Y. The opinion in Thurber v. Blanck, referring to the decision of Bank v. Dakin in the lower court (33 How. Prac. 316), says that it "was precisely such a case as this." In a subsequent case (People v. Van Buren, 136 N. Y. 258, 32 N. E. 775, 20 L. R. A. 446), the opinion is expressed that there was no conflict between the two earlier cases; but the learned judge who wrote it discusses only the questions which arose in the Thurber Case upon the appeal in the second action, and either overlooked or ignored the decision upon the appeal in the first action, which distinctly held that a service of warrant and notice, precisely like that in the Dakin Case, the property sought to be affected being exactly similar, did not constitute a levy upon property of the defendant. We have therefore two co-ordinate courts of last resort, sitting in the same state at the same time, and deciding questions of the construction of state statutes in diametrically opposite ways. Under these circumstances, it would seem that the federal court might with greater propriety conform its decision to that of the permanent, rather than to that of the temporary, state court, unless some later decision should be found, casting doubt upon the authority of Thurber v. Blanck. Such is the practice in the state courts. Smith v. Longmire, 24 Hun, 257. People v. Van Buren, supra, does not qualify Thurber v. Blanck; for the property upon which attachment was levied in that case was the tangible property of the debtors,

which had been seized by the sheriff, and was advertised for sale under prior executions. Of the authorities cited upon the briefs of counsel, O'Brien v. Insurance Co. (1874) 56 N. Y. 52, deals exclusively with the degree of fullness of specification in the notice accompanying the certified copy of the warrant. The property levied on was the amount of a policy of insurance due and owing to the debtor. In Greentree v. Rosenstock (1875) 61 N. Y. 585, the point decided was the manner of serving process where the property sought to be attached was incapable of manual delivery. The property was a debt presently due to the defendant, and for which he might have recovered in an action at law. In Castle v. Lewis (1879) 78 N. Y. 135, the property attached consisted of goods and money. In Bills v. Bank (1882) 89 N. Y. 343, the property was a debt due from a bank to the attachment debtor, evidenced by a negotiable security which was held by the attachment debtor when levy was made. In Anthony v. Wood (1884) 96 N. Y. 180, the sheriff, seeking to levy upon a promissory note and a bond and mortgage given as collateral thereto, which were in the hands of an agent of the attachment debtor, served upon said agent a certified copy of the warrant and notice, and demanded the securities, which the agent refused to deliver. A few days later an assignment of the property was made, with the fraudulent intent to defeat the lien of the attachment. Subsequently the sheriff succeeded in reducing the instruments to possession. The court held that no lien was acquired by the mere service of the warrant and notice. Indeed, it is difficult to see how they could have reached any different conclusion, in view of the provisions of subdivision 2 of section 649, requiring custody by the sheriff in the case of an instrument for the payment of money. The bearing of the following excerpt may be better appreciated if it is borne in mind that the provisions of the second subdivision of section 649 were not in the Old Code of Procedure, which was in force when Thurber v. Blanck was decided:

"This court [has] held, as to the levy permitted to be made upon choses in action, that the attachment reached and became a lien upon only such debts as at the time belonged to the debtor by a legal title, and for the recovery of which he could maintain an action at law, and, as a consequence, where before levy of the attachment he had parted with the legal title, even if with intent to defraud his creditors, there remained in him for their benefit only an equity which the attachment could not reach, and so the sheriff could not assail the transfer as fraudulent. The doctrine of Thurber v. Blanck went to that extent, and has been since approved. The sheriff in the case before us could not assail as fraudulent the transfer of the note and its collateral made prior to his asserted levy [that is, prior to the second levy in which he got possession of the instruments], unless this doctrine is made inapplicable by the change in the provisions of the Code [section 649]. Where the property sought to be attached is 'capable of manual delivery, including a bond, promissory note, or other instrument for the payment of money,' the levy is now to be made by 'taking' the same into the sheriff's actual custody. This provision changed merely the mode of making the levy, but in no respect altered the inherent character of the property sought to be attached. If the note or bond has been transferred, however fraudulently, no lien by attachment is possible, and it is of no consequence that the mode of executing the process has been changed."

The court therefore held that the second levy (made after fraudulent assignment), although accompanied with possession, "gave the officer no right to assail or contest it" (the fraudulent assignment).

Gibson v. Bank (1885) 98 N. Y. 87, is a subsequent appeal of Bills v. Bank, supra. It presents two questions: The first was as to the sufficiency of an attachment and notice duly served on a bank to fasten a lien upon money on deposit, against which a check had been drawn and certified, but which still remained in the possession of the drawer. The second presented a different state of facts. One Rodney, the assistant treasurer of a railroad, while the corporation's deposits in bank were under attachment, opened an account in his own name in the same bank, and deposited therein checks and drafts belonging to the railroad, which were made payable to his order as assistant cashier, and paid out the amounts of such deposits to creditors of the railroad. The court of appeals said:

"It is claimed by the plaintiffs that the service of the attachment gave them a lien upon the moneys so deposited, if they were in fact the moneys of the attachment debtor. * * * This claim cannot be maintained. By the voluntary consent of the owners of the fund deposited, the credit in question was given to Rodney, and the bank thereby became liable to pay the amount to him, and to him alone. It was competent for the parties to give such form to the transaction as they desired, subject only to the right of creditors, in a proper action, to impeach the validity of the transaction. Assuming that the deposit was made in this form for the express purpose of defeating the creditors of the railroad company, the legal title to the debt was nevertheless in Rodney, and any equitable right existing in favor of the creditors against the railroad company could be enforced only through an equitable action. * * * It necessarily follows that there was no property of the attachment debtor in the hands of the [bank] subject to be taken on attachment by its creditors."

The next case referred to is Grain-Cleaner Co. v. Smith (1888) 110 N. Y. 83, 17 N. E. 671. The grain company brought action against the firm of Allis & Co., nonresidents, and procured a warrant of attachment. The sheriff undertook to levy upon a debt due Allis & Co. by Smith for some machinery, by serving copies and notice on Smith. The latter insisted that previous to the attempted levy Allis & Co. had transferred the debt he owed them to the Farrell Company. A second action was then brought in aid of the attachment. The court says:

"One of the main questions litigated upon the trial was whether the alleged transfer by Allis & Co. was made with the intent and design on their part of defeating an intended levy upon such debt by the plaintiffs. If this were proved, it was contended by the plaintiffs that the alleged transfer would be fraudulent and void as to them. It may be assumed that such was the intent of Allis & Co., without affecting the result of this action, for the plaintiffs do not occupy a position which enables them to raise any question as to the bona fides of such transfer. This can be done only by a judgment creditor in an action to enforce the equity of the creditors of Allis & Co. Anthony v. Wood, 96 N. Y. 180; Gibson v. Bank, 98 N. Y. 96. This equity was not the subject of a levy under an attachment, even if an attempt had been made to effect it."

The quotation, however, is obiter; for the court subsequently proceeds to discuss the evidence, and to hold that a bona fide transfer had been made before the attempted levy.

In Warner v. Bank (1889) 115 N. Y. 251, 22 N. E. 172, the property was the interest of the attachment debtor in commercial paper which it had pledged with another bank as collateral to a loan; and the court held that lien was secured by serving attachment and a proper notice on the pledgee, without the sheriff's reducing the paper to his posses-

sion. The attachment debtor in the Warner Case could have recovered possession of his property by action at law, tendering the amount of his debt and interest. His interest in it was wholly different from McHenry's interest, as represented by the certificates. In Hess v. Hess (1889) 117 N. Y. 306, 22 N. E. 956, the attached property consisted of goods and merchandise. The decision in Whitney v. Davis, 148 N. Y. 257, 42 N. E. 661, turns upon an amendment to the Code adopted in 1889, relieving the difficulty which existed before its enactment, viz. that there was no way in which an action upon a money demand against a nonresident debtor who had not appeared could be brought to judgment, if the attachment issued therein had not been levied upon property of the debtor. The opinion follows People v. Van Buren, holding that "a court of equity was not without jurisdiction to interpose in aid of an attaching creditor, even where no specific lien had been gained, and to grant the equitable relief, if special circumstances existed." This is a familiar principle in the federal courts. See Case v. Beauregard, 101 U. S. 690, 25 L. Ed. 1004, and similar cases. But the difficulty of sustaining the bill in this case upon any such theory is the lack of jurisdiction. The attachment actions were brought by a citizen of New York against a citizen of Pennsylvania, nonresident in this district, and were properly removed here. Having jurisdiction of those actions, this court would have jurisdiction of suits ancillary thereto, whatever might be the citizenship of the parties to such suits. But, if the suits in equity cannot be sustained as ancillary to the original actions, this court would have no jurisdiction of the controversy, since the plaintiff and the two trustees—all necessary parties—are citizens of the state of New York. We have reached the conclusion, therefore, that the decision of the state court of appeals in Thurber v. Blanck has not been so modified by any subsequent decisions of that court as to warrant a finding that the service of attachment and notice on the trustees in the actions at law constituted a levy on any property of McHenry; that this suit is, therefore, not ancillary in aid of any specific lien acquired under the attachment, and that, if it could be maintained as an original suit, there is not the requisite diversity of citizenship to give this court jurisdiction. It may be noted that as to $42,000, the proceeds of sales by the trustees of certain Ohio real estate, under stipulation, the bill is an original one to carry out the agreement embodied in the stipulation, and the citizenship of the parties thereto is not diverse. The decrees of the circuit court dismissing the bills are sustained, with costs.